and you now have a readout on your side of the podium that tells you how much time you have left. And I remind you that rebuttal is for rebuttal only. All right, we'll call the first case, U.S. v. Bays, out. And we'll hear first from Ms. Brandt. May it please the Court, my name is Lydia Brandt. I represent Mr. Bays. I would like to ask the Court to acquit specifically on Counts 3 and on Count 4, which I'd like to talk about. Count 3 is the conspiracy to distribute controlled substances, and Count 4 is the use of a firearm in furtherance of Count 3, the drug trafficking count. The government has conceded that the jury charge lacked an essential element, the knowledge element, in it. But the government is arguing that the evidence is overwhelming with respect to its proof, and that's just not the case because the standard it's using is not the correct legal standard. Throughout the briefing, specifically if you look on the government's brief at pages 49, 50, 51, the government continuously refers to the fact that Bays, quote, knew that they were analogs of a controlled substance, or alternatively that someone told Mr. Bays that these chemicals were analogs. The Supreme Court decision in McFadden requires not that an individual know that a chemical is an analog, but that the individual know that that chemical is a controlled substance, in this case at the time of distribution. And more importantly, the government has overreached, because the first predicate for a valid conviction is that that substance actually be a controlled substance. The government has pointed to two or three different points in its brief. First, it's saying that AM 2201 was an analog, and Mr. Bays knew that it was an analog. That's not sufficient. Mr. Bays was dealing in 2201 between the periods of August and December 2011. AM 2201 did not become a controlled substance and wasn't listed on the schedules until July 9th of 2012. And in December of 2011, he had stopped using 2201. And so we don't have the underlying first element, which is that, in fact, it was a controlled substance, and then we don't have a showing that he did not know that it was a controlled substance. Did he testify? Mr. Bays? Yes. No, he did not. What was the evidence that he did not know it was an analog? Well, it's not his burden of proof to show that he did not know. I understand that, but what evidence was there in the record that he didn't know? Was there any affirmative evidence that he didn't know? I don't believe there was evidence in there that he didn't know, and I was going to go through these three different listings that he had. The second one that the government was saying that he knew it was an analog on September 2012, and at that point in time, XLR-11 also was not a federally controlled substance. It was controlled under state law, and that's the confusion that the government keeps reaching to saying that he knew it was an analog. It's not that it was an analog. It's not that it was a state-controlled substance. XLR-11 was not a controlled substance under federal law until May of 2013. And the third point that the government makes is that on May 16, 2013, Mr. Bays knew that the substance was a controlled analog, and they point to a text message. And I do not believe in response to your question, did he know, is there any evidence that he knew? I don't believe that that text message proves that he knew that XLR-11 or PB-22 were controlled substances. These particular drugs became controlled substances on May 16. That text message was sent, I believe it was May 15, from a chemical supplier, and that chemical supplier was saying we have a, quote, reliable source, but we don't know what that source was, that these particular drugs are going to be listed and they will become controlled drugs the next day, May 16. But that text message also specifically states we can't verify this anywhere, and so I don't know how you could say that Mr. Bays knew that these were controlled substances when what you have is this text message that then also referred them back to the DEA website that didn't say anything about these being controlled substances. What's your take on the standard we're looking at? You mentioned it earlier, but what do you take overwhelming proof to mean? Is it nothing more, which is pretty high, though, of summary judgment, that there's no dispute and it's clearly proven one particular way or another? Or just what are we looking for in these text messages and otherwise about the clarity of his knowledge or the clarity of there's no harm to this? Well, I think what we look to, the standard is the McFadden standard, and it is only the standard with respect to knowing that the substance was a controlled substance, not that he knew the identity. No, no, no, I understand, and I've misled you on my question, I guess. It's what is the evidentiary standard, not as what has to be proven, but just how clear must the evidence be? What do you take overwhelming proof to be analogous to, if anything? Or how would you flesh that out for me? I think they cannot be analogous to, and Chief Justice Roberts made that clear in his concurrence. What he said was it's not enough to know that these analogs are analogs or they'll give you some kind of high, and the example that he used was the cough suppressants. There were two different types of drugs. One was an actual controlled substance. The other was not. And merely because there's some kind of proof that they're an analog or that they give a particular effect, like this euphoric effect, that's not sufficient to prove actual knowledge. I mean, if we had Mr. Bay saying this is a controlled substance, I know it's a controlled substance, and we had text messages to that effect, I think you're going to have to go probably there. But the evidence in this case is very cloudy because we had different chemical suppliers stating to Mr. Bay that these chemicals were, quote, controlled or analogs, when in fact they were not. And the reason they did it is because they wanted to move Mr. Bay to purchase a different type of product from him, a product that to the chemical supplier was going to be more lucrative than the one that Mr. Bay wanted to buy. So I think you're going to have some actual showing here that in fact he did know, not merely that we're drawing inferences. And we don't have that anywhere in this particular record. Do you think you have to have an admission by the defendant on the stand that he knew before it would be overwhelming? Well, I certainly don't think that any of the text messages in here even reach the level of drawing an appropriate inference to that effect because when you have the statements that were made with we can't verify this anywhere and we don't know what the properties are, I think that shows you that he didn't have the knowledge. This text message, the third one that you mentioned, he says it's been determined that these particular substances are analogs of the other relevant one and explain the structural similarity. And then whatever you make of the rest of the message, which you want to emphasize to us, it seems to me part of what I was asking earlier is just what extent do inferences fit into overwhelming proof? To what extent is it clear and the rest of this sure looks like just trying to cover himself or maybe purposes like we're looking at right now. Is all that part of what we can properly consider under the standard of overwhelming proof? I think if you're going to draw an inference, you would have to do something again going back to Chief Justice Robert in McFadden when he talked about if this is something like heroin, it's generally acceptable or it's general knowledge that heroin is a controlled substance. These analogs don't have that kind of general knowledge, and that goes back to the cough suppressants. I mean, which one of those two cough suppressants are controlled substances? So I don't think you can draw an inference that just because we know that that chemical suppresses coughs, that if those chemicals are used for recreational use and one is a controlled substance and one isn't, that we can therefore infer that that is a controlled substance and the individual had knowledge. Let me ask you one final question. Sure. Did Mr. Bay's attorney argue that he had no knowledge to the jury in closing? I don't remember the closing argument right now, but I do know that repeatedly throughout the trial the defense attorney was very adamant that the government did not prove knowledge and that that level of proof had to be in the jury instruction and it was not. Thank you very much. You have some time left for rebuttal. Mr. Anderson for Mr. Coleman. Thank you, Your Honor. May it please the Court. I came to address, since the government has acquiesced and conceded that my client should be acquitted on count three, I will address counts one and two as applied to him only. In here we have two fraud charges. The first one deals with defrauding the government by their heinous act of misbranding these controlled substances for human consumption. Now, the prosecution fails, as we have indicated in our brief and in our reply brief, because there is no evidence that any act was committed with specific intent to defraud or mislead an identifiable agency. In the indictment, the identifiable agency is the FDA. And they had one individual come down and testify from the FDA. The citing on that is United States v. Mitchell Tree, but the Fifth Circuit concurrence in that is United States v. Arlen, and that's page 19 of the appellant's brief in this case. Now, please excuse my voice. I've got something. I don't know what it is. If you can't understand me, let me know, and I'll repeat myself. You do the same. There is absolutely nothing. What do you make of the government's November 25, 28, J letter where they cite us to United States v. Hager, ask you your argument on count one? Is that what do you make of it if you've looked at it? Do you remember the letter and the reference to U.S. v. Hager? The letter was filed by the court, by the government. Yes, on November 25, where I don't know if it was Mr. A or who did it. That case was overruled by the United States v. Mitchell Tree and Arlen. It was disparaged in both cases. Are you on this point that it's not the customers, that it's a governmental agency that has to be defrauded? There is within that case itself a statement that the indictment in that case alleged both ways. The indictment in this case alleges only that the government agency was defrauded, and as this court well knows, there is no amending of the indictment during trial unless the court actually makes that ruling on the evidence and no such ruling was made, or the case has to go back to the grand jury. Now, this case went to the grand jury four times before we got to trial. I think they had refined it as much as they could. So that case is overruled. I don't even know why it was brought up. It was 10 years before Ellis, 10 years before Arlen. You can move on. Okay. Now let's get to count number two, which is the mail fraud case in this case. In this case, strangely enough, they said that the victims of this mail fraud were the people who bought it. And the reason they did that is because in McNally v. The United States Supreme Court said unequivocally that the mail fraud statute is limited to schemes aimed at causing deprivations of money or property. And you have to allege somebody who paid money got defrauded. But was there any evidence of it? No. There was no evidence from any consumer, any buyer, any person who inhaled these substances that they were in any way defrauded. So they seek to shift again the argument that that's not even required. But it is required. So on counts one and two, both of these individuals should be acquitted. Now, I've got to address something I heard the court talk about in regards to the standard on what should be done in these cases regarding, say, McFadden. This case or this law will never be straightened out until one court and the Supreme Court gets to the Supreme Court realizes that this statute is unconstitutionally void for vagueness. We didn't raise that. But that's what's wrong with it. Number two, it will never be resolved in any manner until this junk science is removed from the courtroom in a criminal case. If you read the testimony of the government's two witnesses and the two witnesses that were called on behalf of the defendants, there's no question that this is nothing but junk science based on the feelings they got about six rats who were ingested some of these materials and four other rats who didn't react whatsoever. I say that's junk science, and my time is up. Thank you, sir. Thank you, gentlemen. Okay, Mr. McKay for the government. May it please the Court, Brian McKay on behalf of the United States. I'd like to begin by answering Judge Davis's question about whether Mr. Bays argued knowledge to the jury, and absolutely he did. The district court allowed this evidence in because she found that it went to the mens rea for the conspiracy, whether he joined a conspiracy knowing of its unlawful nature, its unlawful purpose, and with willful intent to further that unlawful purpose. And so, yes, he did argue that to the jury. One of the things I want to clarify up front about Mr. Bays's argument is that it confuses the issue of what is a controlled substance and what is an analog. It's absolutely correct that AM 2201, for example, didn't become a scheduled controlled substance until July of 2012, and at that point it stopped being, by definition, an analog. But prior to being scheduled and listed as a controlled substance, it was an analog, and the evidence is overwhelming in showing that Mr. Bays knew that it was an analog. Let me just ask you this. Can you distinguish the Stanford case? I mean, to me, the Stanford case was even stronger for the government than this case is because the judge didn't charge on knowledge, but they gave hopefully what she thought was going to be an instruction and an interrogatory before they would correct that, in which the jury found, yes, he did have knowledge, but because the judge didn't charge that that had to be found beyond a reasonable doubt, we vacated that. So how can you distinguish that case? Certainly. There was no attempt at an interrogatory here. Had the court done that, I'm confident that the jury would have found because the facts here are so much stronger than in Stanford. In Stanford, the government was prosecuting someone who was on the periphery of this conspiracy, someone who the best evidence the government had for showing that Mr. Stanford knew that these were analogs revolved around meetings that he had attended, where those that were in charge of this conspiracy discussed the specific chemicals and their properties and things like that. But even then, the record wasn't clear in showing that he was even at those meetings at the relevant time. Yeah, but, I mean, we know what the jury thought about it. It couldn't be clearer that the jury was satisfied that he had knowledge, yet we said because the charge wasn't given beyond a reasonable doubt, it can't be affirmed. Yes, and there, what the court had before it was a record that showed either he was or there's some evidence, some affirmative evidence, that he wasn't there at those meetings at the relevant time. The jury chose to believe that he was there at the relevant time, but on harmlessness this court said there are really two versions of the facts. He either was there at the relevant time or he wasn't. We can't, this court cannot choose among those two competing versions of the facts. We don't have that here. We have one version of the facts. The government has shown- Tell me what was said at the meeting that nailed it for you. For our case, for Bayes, we have three. First, with respect to AM2201, Alex Reeves testified. He said that by August of 2011, he knew that AM2201 was an analog. He had had a shipment of chemicals come into the country that were intercepted by Customs, and Customs warned him, this is an analog. Well, that caused him to reformulate his company, shut it down, reformulate it as a different company, in his words, under the radar, and he warned all his customers that these were illegal. In fact, he specifically recalled a conversation with Mr. Bayes in which he said, AM2201 is an analog. It's illegal. You should buy my other product, but Mr. Bayes- How do we know that he wasn't thinking that this was illegal under state law? Which brings us to number two, the second chemical, 5-FUR-144-XLR11. In September of 2012, we have the text messages. Again, uncontroverted. There's no evidence that these messages didn't occur. They occurred. And in those, among those discussions, I think it's Exhibit 219, where Mr. Bayes says, hey, Sam, I have some 5-FUR left over that I ordered from China. It's illegal here, considered an analog. Now, Mr. Bayes now wants to insert language into that text to say, well, what he meant was that it's illegal under Indiana law. I don't read that text message that way when he says, I ordered it from a foreign country and it's illegal here. The natural reading, the natural meaning, I think, given would be that it's illegal here in the United States. But don't lose track of where you're headed, because I think there's still one more to go in answering Judge Davis's question. But let me ask you about that, which gets back to what I asked Ms. Brandt. Just what are we really looking at when we're trying to decide, even though the jury wasn't told correctly, everybody can be satisfied that this is the answer the jury would have been given if they had been given a correct instruction? So what worries me about each of these is that Bayes has some response to that. There is something that might make a fact question out of it. Is it just under state law versus federal law? The fact that Bayes' supplier Reese told him something, does that mean it's beyond question that Bayes had to accept that that was correct? So how do you read the standard that we need to apply? Is it that any contrary view of that evidence is simply implausible? Is less than that? No, Your Honor, and I would point to United States versus Matthews, which is the example that I cited in my brief. There it wasn't that one could take a contrary view or discredit or not credit the witnesses who support it. The court was looking at is there contrary evidence? But isn't that putting the burden, much as the response was when Judge Davis asked the question, isn't that putting the burden without even it being an issue of a bad jury instruction yet, putting the burden on the defendant to put positive evidence in the record? No, Your Honor, I don't believe so. The court didn't take that view in Matthews, and it didn't take that view in the post-Apprendi cases where we had jury verdicts that didn't include a jury finding on drug quantities, where this court, again, in that situation, too, looked at the verdict and saw, look, numerous people came in and testified to certain quantities. It was undisputed. It was uncontradicted, and that's the same here. Mr. Bays had every incentive to, and, in fact, he did put forward all the evidence that he had or all the view of the evidence that he could muster to argue that he didn't know he was dealing in controlled substance analogs. He did that. He didn't have a special interrogatory that focused on that question, did he? Your Honor, you're right. And had we had that, then maybe we wouldn't be arguing this if we would have had it properly with the burden of proof and things such as that. But we didn't have it in Matthews, and we didn't have it in, you know, Peters, Green come to mind as the post-Apprendi. Stanford. I'm sorry? And Stanford. And Stanford. And Stanford they attempted, but unsuccessfully so. And I'd like to go back to the point of he has this plausible, what the court may think is at first blush, plausible denial. With AM2201 he says, Alex Reese was wrong because AM2201 didn't become scheduled until many months later. Well, it didn't become scheduled until later, but at that time it was an analog. And I think very important on this point, going to XLR11, when Mr. Bays tells Sam Mandalay, I have some five-fur, it's illegal here, considered an analog. Let's suppose, let's give him the benefit, and suppose that he is discussing, thinking in his head, it's illegal under Indiana law. Well, what is the standard for Indiana law? It's precisely the same for federal law. So in McFadden, the Supreme Court said that the government can show knowledge in one of two ways. Either he knew its legal status as a controlled substance or an analog, or he knew those attributes, those properties of the substance that made it an analog. It wouldn't satisfy the standard if he just knew it was illegal under Indiana law, would it? He would know that his possession of it is an analog. But isn't that right? If he just knew that it was illegal under Indiana law, that wouldn't mean that it was a controlled substance under federal law. It wouldn't necessarily show it's a controlled substance under federal law, but when he says it is an analog, and he used that term, it's illegal, it is an analog. When he says it is an analog under the standards applied by the state of Indiana, he knows everything that he needs to know to know it is an analog under federal law. The attributes are exactly the same. Substantial similarity in chemical structure and pharmacological effect or intended pharmacological effect. Let me ask you back to knowledge or continuing on the issue of knowledge. So Indiana law is written that way in the way that you just described it, and he would have to know, therefore, that Indiana law standard on analog is exactly the same as the federal standard? And we really are, without your instructions, it seems to me requiring an awful lot to be assumed from the record. But is my premise correct, that you would look in Indiana law and find what an analog is for Indiana law purposes, you compare that to federal law and see it's the same? I believe that when Mr. Bays, yes, when Mr. Bays says, I know that this substance, 5-4-1-44, is an analog, he just said that. So either he knew it was an analog under federal law, which is sufficient and conclusively shows he knew, or he was saying, I know that it is an analog under Indiana law. And when Indiana law mirrors federal law perfectly... Wouldn't he have to know that, too, in order to have the necessary knowledge? Well, the record, again, is uncontradicted from testimony of the participants in the scheme who said, we were aware of the analog statute, the analog act. We constantly monitored the analog act. We kept track of what was and what wasn't an analog. And if I may, you know, fast-forwarding to the... Yes, yes, how would the jury know that they had to find knowledge beyond a reasonable doubt, just as it was in Stanford? Without that instruction? Yes. Well, the jury certainly had to know, had to find that the defendants joined in an unlawful conspiracy, knowing of the unlawful purpose of the conspiracy and with the intent to further that unlawful... Well, that could be state law, though, couldn't it? Possibly. But if the question is, you know, why couldn't Mr. Bays be acquitted of this if the jury didn't know, if the jury truly believed that he had no knowledge that these were controlled substance analogs, then, as he argued to the jury, they would have acquitted him. But they didn't. And going to that third chemical, PB-22 and 5F-PB-22, in that exchange, one of the things I want to clarify about the record, when Ms. Brandt talks about that text exchange in which Mr. Boyer, at Mr. Bays' direction, says we have a reliable source, we can't confirm it, what he's talking about there is what the DEA, whether the DEA is going to actually list the chemical, not whether or not the chemical is an analog. Instead, for that, they point, they name the lab Cayman Chemical. They name the lab, refer to it as the leading forensic lab in the nation, and says that that lab has publicly concluded that PB-22, and later they say the same for 5F-PB-22 and other chemicals, that they're analogs of JWH-018. Even discussing the chemical similarity or where they are slightly different, but noting that that forensic lab, the leading forensic lab, has concluded that it's an analog. And so there, we have even the second way that McFadden said the government can prove knowledge. Again, this is uncontroverted. When we look at those cases where, such as Matthews, where this court has held a missing element was harmless, we see that what the court has credited has been testimony of co-defendants and others in Matthews. In Matthews, of course, the issue was the defendant had been convicted of carjacking, and the issue was that after trial, it became evident, I believe from Apprendi, that the jury did not find that he did, or was never asked to find, that he committed this offense as part of and in promotion of criminal gain. You know, my impression is that this was a somewhat confusing situation with the government trying to stay ahead of the modification of the product that was being sold. And so, I mean, why couldn't the jury have thought, well, you know, this was confusing and the proof is just not there on knowledge? If, in some circumstances, in some cases, that may be. But when we have Mr. Bays being told by his supplier, who's selling him the chemical, saying this is an analog, that's not confusing. When we have Mr. Bays telling his chemical suppliers, I can't use that. That is an analog. It's illegal. I think your opposing counsel said that Bays could have reasonably thought, well, he's trying to sell me a more expensive drug or a more lucrative drug. There's no evidence that it was more lucrative. I believe Alex Reese testified that what he was trying to do was move him to a different drug because he accepted that AM2201 was illegal. It's not that he really wanted to sell it, but he was making good money, and he said he knew he'd continue to sell it knowing that it was illegal. Mr. McKay, that again gets me to how we are supposed to be making this decision on the overwhelming evidence when, in fact, this was not a contested issue and there would be no reason for some of these other points factually to be made by either one of the defendants we have before us. And yet, in the record, yeah, it doesn't have composing evidence because that's not what was at issue. Response? Absolutely. I think I would point the court to Nader, Nader v. United States. And there we see that the defendant, even the defendant took a very restrictive view of when a court should be able to find that an instruction missing an element was harmless, and it proposed three circumstances. One of those circumstances that even the defendant acknowledged should carry the day on harmlessness would be when the defendant admits the element that is missing. And I would submit that that's what we have here. Certainly in the instance of 5FUR144, we have it right not out of his mouth, but off of his fingertips. We have his admission. He understands that this substance is an analog, not just that it's illegal. He did say he understood that it was illegal, but he understood that it was illegal because it was an analog. Thank you. A little bit further, different direction, but if we were to disagree, and I have no idea where we're going to go with this, as to count three, if we set that aside, do count four and five fall? Yes, I believe so. They would go back for trial also. They are supported by count three. On count two, who needs to be the target of the fraud, and what do you make now of your 28J letter that you sent? My 28J letter was on count one. Right. Oh, did I say two? Yeah, count one. If the court is referring me to count one, I would say that this case was not indicted exclusively as a fraud on the FDA. It was not tried exclusively as a fraud on the FDA, and the evidence showed the government tried a case that showed that the fraud was on those who bought included, those who bought this spice. And Kyle Boyer testified that the purchasers, the resellers of this spice would occasionally have the testing done on the material when they would purchase it. They would do their own independent testing. When it came back as showing that there was a banned substance in it, they sent it back. They sent it back for refund or replacement because they didn't want to get in trouble, to use Kyle Boyer's words, and they did that because there were material misrepresentations made. How was it a fraud on the buyers? Because in two ways. One, there was the misrepresentation that it was not for human consumption, but even if we set that aside, there was the misrepresentation both on the packages themselves and also in the affirmation letters saying that these are compliant substances, DEA and state compliant. So they were representing that there were no illegal substances and that was, in fact, wrong, and they knew that that was wrong. Well, they got what they paid for, though, didn't they? I mean, they got spice that they got a kick out of. Well, the resellers, first, they didn't always get what they bargained for because they wanted compliant substance, and when they didn't get compliant substances, they sent it back. But also the repurchasers, and this is where I cited Mitchell Tree in the 28J letter. The repurchasers wouldn't know. Maybe they got what they wanted in the sense that they got something they could smoke and get high off of, but they were told by the packages that these were compliant substances. There's nothing illegal about it. There's nothing banned in it, and that was simply wrong. And this court has recognized in Haga, in Arlen, it's flipped. And there the court started with a presumption knowing that defrauding the purchasers is usually the way the government approves it, and the defendant there wanted to hold it only to that. But in Arlen, the court said that defrauding an identifiable government agency is another permissible way to show misbranding under Section 331. I see that my time is up. I would ask the court to affirm in all respects except count three to Mr. Coleman. Okay. Thank you, sir. Okay, Ms. Branch, you have five minutes for rebuttal. To correct something that the government said, there is evidence in the record that the chemical suppliers were trying to entice Mr. Bays to get a different drug rather than the one that they were selling. It was Nutragenomics. It was Mr. Green who was making the representation, and he had some sort of organic product that he was selling, so he made those representations. I'm sorry I can't give you a record site right now. I do want to go back to the issue of the analog. In Stanford, what the court talked about here was an example of a defendant who was conducting an identity theft scheme, and it would be impossible for him to conduct that identity theft scheme without knowing that he was stealing the identities of real children. The scheme could only work if the children actually existed. So in Stanford, what you had is the finding of knowledge, according to the opinion, was logically implicit in the guilty verdict on identity theft, so you could make that inference there. You can't make that inference here in the Bays case. Merely because a chemical is an analog doesn't mean it's a controlled substance. So you're going to have to have actual knowledge that it is controlled. And I'd like to point the court to McFadden, specifically Chief Justice Roberts' concurrence. He said that the majority opinion that says, by showing the defendant knew the identity of substances he possessed, he said those statements should not be regarded as controlling if the issues arise in a future case. He said the court's statements on these issues are not necessary to its conclusion that the district court's jury instructions did not fully convey the mental state required. And so we go back to this issue, is knowledge logically implicit in the verdict? And the answer in this case is no. There are many, many different analogs that may or may not be controlled by state law. Some were controlled by one state, but not other states. It was all over the map with respect to what this stuff was. And it was very difficult for any of these individuals to keep up with what these chemicals were and what was legal and what wasn't legal. Am I allowed to talk about the issue of mislabeling or branding? Even though I didn't raise that, I think that may have gone to ____. I don't think the government argued that, did they? Well, he raised the issue about how they weren't being fooled. I think the advertisements in the websites amply address the issue. And, in fact, their own expert, Dr. Lee, who was from the FDA, had said that the intent doesn't need to be confined specifically to the package. I believe the government said, you know, did this knowledge of other use, was that happening simultaneous at the same time that the drug was being given, like maybe some sort of leaflet went in with the drug? In this case, what you had is the advertisements that were telling what the drug or how it is intended to be used. You had CDs. You had a rap video. You had a Las Vegas trade show. So under Dr. Lee's testimony, the intended use, who the manufacturer was, the website, which was the contact information that was being required, all of that necessary information was in there. So we don't have any defrauding or conspiracy to defraud the United States with regard to that. Well, what about the statement counsel said that Bayes made, he understood this drug was an analog? It doesn't matter if he understood it's an analog. And we go back to what Justice Roberts said. You must know that it is a controlled substance. And merely knowing that it's an analog, even if he did know it was an analog, even if he did know it was an analog under state law, that doesn't make it a controlled substance for federal law. But does the context of that statement allow the inference that he could have been talking about state law? No. I mean, you can draw any kind of inference. I mean, you have to come to the burden of proof, which is beyond a reasonable doubt. And the government never did that in its case because it never believed it had that burden of proof. Okay. Thank you, Mr. Moran. Thank you, counsel. We have your case.